**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Rita Keith, as Administrator of the | ) | CASE NO.1:22 CV 1809 |
| Estate of Arthur Keith, Deceased, | ) | |
| and Individually as the Natural Parent | ) | |
| and Mother of Arthur Keith, | ) | JUDGE PATRICIA A. GAUGHAN |
|         Plaintiff | ) | |
|     vs. | ) | |
| | ) | |
| | ) | |
| James Griffiths, | ) | <u>Memorandum of Opinion and Order</u> |
|         Defendant. | ) | |

<u>Introduction</u>

This matter is before the Court upon defendant's Motion for Summary Judgment. (Doc. 78).  This case arises from the fatal shooting of Arthur Keith by defendant. For the following reasons, the motion is GRANTED.

<u>Facts</u>

Plaintiff Rita Keith, as Administrator of the Estate of Arthur Keith, Deceased, and Individually as the Natural Parent and Mother of Arthur Keith, filed this Complaint against defendant James Griffiths, in his individual capacity and capacity as an employee of the

Cuyahoga Metropolitan Housing Authority. The Complaint alleges that plaintiff's son, Arthur Keith ("Keith"), was shot and killed on November 13, 2020, by defendant, an officer with the Cuyahoga Metropolitan Housing Authority Police Department ("CMHA PD"), at the King Kennedy Housing Complex located in Cuyahoga County, Ohio.

The undisputed facts establish that defendant has been employed as a police officer with the CMHA PD since 1992. On November 12, 2020, CMHA PD received a call from a male reporting that a black van with tinted windows, suspected of being involved in the recent discharge of a firearm and illegal activity, was parked in a parking lot near 6201 Haltnorth, a CMHA property.[1]  Officers were dispatched to the location, but the van was not located.  On November 13, 2020, CMHA PD received another call, believed to be from the same male who had called the previous day, again reporting that a black van with tinted windows, suspected of being involved in illegal activity, was parked in the same parking lot.  CMHA PD Officers Robert Lenz and defendant and Sergeant Paul Styles responded to the call. (CMHA PD Chief of Police Andres Gonzalez decl.). Defendant arrived on the scene, followed by Sergeant Styles and Officer Lenz. Defendant proceeded to the front, passenger side of the vehicle.  The other officers went to the opposite side.  A male, later identified as Keith, exited on the passenger side.  Styles and Lenz heard defendant yell that Keith had a gun. Then they heard gunshots. Keith ran a short distance and fell to the ground. Styles arrived first to his prone body and observed a gun which was then secured, photographed, and examined by the Cuyahoga County Regional Forensic Science Laboratory. The DNA on the gun matched only Keith's DNA.

---

[1]     Audio of the dispatch calls has been filed. (Doc. 77).

Members of the Cleveland Division of Police Use of Deadly Force Investigation Team ("UDFIT") responded to the scene and interviewed Sergeant Styles and Officer Lenz. They then did further investigation, including follow-up interviews and an interview of the defendant. Styles told the UDFIT that he received a call for a male suspect with a firearm in the area of 6201 Haltnorth in a vehicle with an out-of-state plate. He spotted the vehicle in the parking lot. Defendant and Officer Lenz also arrived on the scene. Styles was at the rear of the suspect vehicle while defendant was at the front. Styles heard defendant yell, "Drop the gun, drop the gun!" Styles heard several gunshots, but did not know who fired the shots. He saw the suspect run south and then west through the courtyard. All three officers pursued the suspect on foot. When Styles rounded the corner, he saw the suspect lying supine on the ground. The suspect's Glock model 19 was on the ground near the suspect's right hand. After observing that the suspect had been shot, Styles notified CMHA radio to send EMS and additional units. Defendant secured the suspect's firearm. (Doc. 81 Ex. 2).

Styles provided a videotaped interview to the UDFIT on December 11, 2020. A summary of the interview provides that Styles stated he was closer to the back of the van when he heard defendant state, "He's got a gun!"[2] Styles heard gunshots, a slight pause, and more gunshots. Styles did not see who was shooting. Styles then saw Keith lying prone on the ground near a tree stump. Styles ran over to Keith and saw a black firearm on the ground near Keith's right hand. After requesting EMS, and finding no pulse on Keith, defendant secured the firearm which looked like a Glock with an extended magazine. Lenz started

---

[2]     Upon viewing the videotaped interview, Sgt. Styles said that he heard defendant say, "Stop, don't move, gun." This was followed by multiple shots.

3

administering first aid, and residents began arriving on the scene who were hostile towards the police officers.  (Doc. 81 Ex. 11).

Styles testified at a deposition that when he walked up to the vehicle he did not see Keith holding a gun, did not see Keith pointing a gun at defendant, and did not see a gun when he was chasing Keith.  (Styles depo. at 84).

Styles also submitted a declaration with the Motion for Summary Judgment. He states that he arrived on the scene after defendant and before Lenz. The van was backed into the parking spot and was running. Just behind the back bumper of the van was a sidewalk. Defendant's vehicle was stopped beyond the passenger side of the van which had tinted windows. Defendant approached the van from the passenger side and Styles from the driver's side.  Lenz was behind Styles. Once they confirmed no one was in the driver's seat or front passenger seat, Styles moved toward the backseat. It was difficult to see because of the tinted windows, but Styles could see a silhouette of a person in the back passenger side move forward. The van had a sliding door and it was opening.  He heard defendant say, "Stop, don't move" and "gun." He then heard shots fired but could not see who had fired or if someone had been shot. As he was making his way around the van toward the other side, defendant yelled, "He has a gun, he has a gun." Styles did not see a suspect, but then looked down the sidewalk and saw a male wearing blue running toward 6201 Haltnorth.  Styles started to run after him, but lost sight of him as he rounded the corner. When he peered around the corner of the building, Styles saw the suspect on the ground in front of 6201 Haltnorth by a tree. Styles was the first to reach the suspect where he had fallen and observed his gun on the ground a few inches from his right hand. Defendant arrived next and also saw the gun. The two secured

4

the suspect in handcuffs and when Styles realized he had been shot, he called EMS. Lenz arrived and administered aid. A very angry and hostile crowd gathered quickly. While Styles watched the crowd, defendant secured the gun. (Styles decl.)

The on-scene statement that Officer Lenz provided to the UDFIT stated that defendant and Styles were the first to arrive on scene. Lenz exited the zone car and walked up to the suspect vehicle.  He heard defendant yell, "Drop the gun, drop the gun!" He then heard several gunshots, but did not know who fired the shots. He saw the suspect run south and then west through the courtyard. All three officers pursued the suspect who he then saw lying supine in the courtyard and not responding to verbal commands.  First aid was administered. (Doc. 81 Ex. 2).

Lenz's December 11, 2020 videotaped interview stated that he heard defendant yell "show me your hands," and that "moments later gunshots happened." (Doc. 82).

Lenz testified at deposition that he first saw Keith when he was fleeing and he did not see him with a gun. (Lenz depo. at 59).

In his declaration, Lenz states that defendant arrived first on the scene, followed by Styles, and then himself. The van had very dark tinted windows and the officers were unable to see inside, even with the spotlight. Defendant approached the van from the passenger side and Styles approached from the driver's side.  The van was backed in and running. As he walked toward the van, Lenz was watching someone in a red and white covering walk away from the van that matched the description of the dispatch call.  He heard a door pop and defendant give the commands that included "show me your hands." Then he heard three or four shots fired and saw the suspect wearing a blue hoodie and jeans flee south toward 6201

Haltnorth. Styles was the first to chase the suspect followed by defendant.  Lenz started to run but then returned to the van to make sure there were no additional occupants. Lenz heard Styles call for EMS over the radio. Lenz grabbed his medical bag and ran to the location where the suspect was lying on the ground.  He saw defendant holding Keith's gun. When he was rendering medical aid, a growing crowd of angry and hostile residents had gathered and were shouting at the officers. Since they were in an open area, it was necessary to secure the weapon.  (Lenz decl.)

The UDFIT interviewed defendant on February 12, 2021. A brief synopsis[3] of the interview provided by the interviewing officers states that defendant responded to the area in connection with a male in a dark colored vehicle that was involved in an aggravated robbery, felonious assault shooting that occurred earlier in the week. Upon his arrival, defendant spotted a dark colored vehicle with out-of-state license plates.  The vehicle involved in the prior crime also had out-of-state plates. Defendant parked his marked police car near the suspect vehicle and as he was approaching it, he observed a male exiting. Defendant ordered the male to show his hands and defendant observed the male holding a firearm in his left hand while attempting to close the vehicle door with his right hand. Defendant ordered the male to drop the gun but the male ran away from the vehicle. Defendant chased the male and the male turned towards defendant with the firearm still in his hand.  The male then raised the firearm

---

[3]     Plaintiff filed a Notice of Manual Filing of Exhibits which contains the video recorded interview of defendant. Defendant objected to consideration of the exhibits on the basis that the notice was filed after the deadline for filing the brief in opposition, the notice does not identify the videos contained therein, and the videos have not been authenticated in accordance with Fed. R. Civ. P. 56. The objection is moot because the video provided by plaintiff lacks an audio component and, therefore, the Court was unable to consider it.

6

towards defendant. Defendant was in fear of his life and fired his service weapon at the male. The male continued to run a short distance and then fell to the ground. Defendant approached the male and observed the suspect's weapon on the ground near him. Defendant kicked the firearm away from the male. Defendant then handcuffed the suspect.  (Doc. 81 Ex. 13).

At deposition, defendant testified that after Keith exited the van, he "ma[de] three to four steps" and then "turned and raised his left hand up at me as if he was going to shoot. I felt I was going to get shot at that moment and that's when I fired." (Griffiths depo. at 197).

Defendant's declaration further states his version of the events. He heard a dispatch regarding a suspicious black van with tinted windows and out of state license plates suspected of criminal activity which involved a shooting that had occurred a few days earlier. He, Sgt. Styles, and Officer Lenz responded to the call. He and the other officers were in full CMHA PD uniforms and individually operating CMHA PD marked units. Defendant was the first officer to arrive in the parking lot. He pulled past the suspicious van, which was backed into a parking spot, onto the passenger side of the van. Sergeant Styles pulled in after defendant and stopped his unit one or two spots away from the van on the driver's side. Officer Lenz pulled in behind Styles.  Defendant exited his vehicle and initially walked toward the sidewalk one car  from where the van was parked. He saw Styles do the same thing on the driver's side of the van. When defendant and Styles arrived at the sidewalk, Styles was going to approach the driver's side of the van and defendant was going to approach the passenger side. As defendant walked up the passenger side of the van, he could not see inside the van due to the tinted windows.  Defendant tried to look through the front passenger window but could not see in the van. He also tried to look through the front windshield but could not see in the van.

Because the van was running, defendant knocked on the front passenger door window and announced "police" but received no response. Defendant then flicked the handle on the front passenger door. He found it unlocked and opened it. Defendant was then able to confirm that there were no occupants in the driver's seat or front passenger seat.  He saw a key fob on the front, center console of the van. Defendant then turned and looked at the back seat of the van from the front passenger door. He first looked at the seat behind the driver's seat and there was no one in that seat. Defendant then looked over at the right back passenger seat and saw a figure wearing a blue shirt move closer to the sliding door on the passenger side of the van attempting to hide or conceal himself. At that point defendant announced "police" and "let me see your hands." There was no response from the occupant.

Defendant then heard a click and the back passenger sliding door started to open. As the door started to slide open, defendant could see that the suspect, later identified as Keith, had his right hand on the door as if guiding it open and he was holding a gun in his left hand straight across his stomach. Defendant yelled at Keith to "drop the gun" several times so that Styles would know that Keith had a gun. Keith did not comply with the command to drop the gun and held on to it. At that point defendant had his gun drawn.

As defendant was yelling "drop the gun," Keith started to slide out of the van and defendant tried to back away but his back was against the inside of the open front passenger door. Keith exited the van and took three or so steps toward the sidewalk and the back bumper of the car parked next to the van. As he was moving toward the sidewalk, he turned sideways half facing defendant, raised his left arm, and pointed his gun at defendant. Defendant felt that Keith was going to shoot him and feared for his life. Defendant fired his

8

weapon. Keith then started running south and Styles ran after him. After a few seconds, defendant followed Styles on foot in the direction that Keith had fled.

Styles was the first officer to reach the area where Keith had fallen to the ground and saw the gun in front of Keith. When defendant saw the gun, he stepped on it and moved it out of reach for officer protection.  Defendant then assisted Styles in handcuffing Keith. Defendant reached for Keith's left arm from underneath him and secured him. He realized that Keith had been shot when he saw blood.

As this was happening, a growing crowd of hostile and angry residents started to gather. For the officers' safety and protection and to prevent anyone from grabbing the gun and using it on the officers or taking it, defendant secured it. In picking up the gun, defendant was careful to hold it in a manner so that he did not touch the trigger or the slide or the interior portion of the magazine. Once Chief Gonzalez and Commander Burdyshaw arrived, the Chief ordered Burdyshaw to secure the weapon. Defendant followed Commander Burdyshaw to his CMHA PD vehicle, and he secured the weapon in his trunk where it was ultimately photographed. (Griffiths decl.).

Chief Gonzalez's declaration provides that when he arrived on the scene with Commander Burdyshaw, he observed defendant holding a non-CMHA PD weapon which defendant confirmed was Keith's and found on the ground where he had fallen. Gonzalez ordered Burdyshaw to secure the weapon and it was immediately taken to the trunk of the police vehicle.  (Gonzalez decl.) Burdyshaw testified that he took possession of the firearm from defendant and secured it in the trunk.  (Burdyshaw depo. 22-28).

Crime scene reports include photographs where Keith fell to the ground, a key fob, a

9

plastic bag containing suspected marijuana, and swabs of the suspected blood. (Doc. 81 Ex. 9). There are no crime scene photos of a gun near the body of Keith at the location in the courtyard where he fell to the ground. Cleveland police photographs of the crime scene include a Glock 9mm with an extended magazine identified as the suspect's weapon and photographed in the back of an unmarked CMHA police vehicle. (Sgt. David Borden depo. at 146, Ex.3).

A DNA Laboratory Examination Report states the conclusions of the examination of the Glock model 19. (Griffiths decl. Ex. B). The laboratory report found a match between the grip and trigger areas, the surface of the slide, and surface of the magazine and Keith.  It found no statistical support for a match between these areas and defendant or Burdyshaw. (*Id.*).

Plaintiff identified two juvenile eyewitnesses[4] - Jahzir Melton and Demarion Starr.

A Cleveland Police Officer dispatched to the scene on November 13, 2020, reported:

A young male juvenile by the name of (Jahzir Milton[5]) stated to me "I saw everything." Jahzir stated that he was taking out the trash when he saw 3 police cars pull into the parking lot.  Jahzir then stated that when he was walking back from the trash dumpster, he saw the male later identified as Arthur Keith get out of his vehicle and tried to run and that when the police officers shot him 2 times. Arthur ran pass [sic] his apartment and around the corner.

(Doc. 81 Ex. 17). Melton's deposition was taken. When asked whether he saw Keith turn and point his gun at the police officer, he responded, "No." He testified that he did not know Keith had a gun, and that he was shot right outside the passenger door of his vehicle and he

---

[4]      A third juvenile, Rayshawn Stewart, was previously excluded as a witness.

[5]      The witness's name is spelled Melton at deposition.

was trying to run away. He also testified that he could not see Keith's left hand, but could only see Keith from the shoulders up.  He could not see what was in his left hand, and he did not see what was in Keith's hands as he was running. (Doc. 63 at 79-89).

Demarion Starr was interviewed by members of the Cleveland police homicide unit in March 2021. (Doc. 81 Ex. 16). He stated that he saw CMHA police approach Keith's vehicle in the parking lot. The CMHA police officer was on the drivers side of the vehicle. As Keith exited the passenger side, the CMHA officer had his firearm out and pointed at Keith. Keith turned away from the officer and started to run around the front of the vehicle. Starr heard several gunshots and the officer shot Keith in the back. He did not see Keith with a firearm in his hand. (Doc. 81 Ex. 16).  Starr's deposition was taken. As discussed below, his testimony was inconsistent with the other documented evidence at the scene.  Further, he testified that he did not see Keith holding a gun, but he could not see Keith's hands at all times.  (Doc. 64 at 98).

Monica Hatcher, an adult, was also interviewed after the incident. She told police that she observed Keith running from a CMHA police officer who yelled at him to stop. She heard gunshots and Keith fell down.  She did not see Keith with a firearm. (Doc. 81 Ex. 16).

Erica Armstrong, M.D. conducted the autopsy and issued her report. (Doc. 81 Ex. 3). The report states in pertinent part:

**EXTERNAL AND INTERNAL EVIDENCE OF RECENT INJURY:**

**Trunk**

**1**.      A gunshot wound is of the postero-lateral left upper trunk.
Entrance wound: The wound consists of a ¼" in diameter defect with eccentric pink marginal abrasion that measures up to ¼" in width. The wound is located 54 ½" from the left heel and 13" from the posterior midline. There is no fouling or stippling.

11

**Path:** After perforating the subcutaneous tissues, the gunshot wound perforates the posterior left 7" rib (with inward beveling and fracture fragmentation), left upper lobe of lung (through and through), pericardial sac, antero-lateral left ventricle (with transaction of proximal left anterior descending coronary artery), septum, anterior right ventricle, pericardial sac, right para-sternal soft tissues of intercostal space 3-4 (with grazing of the sternum), and the overlying subcutaneous tissues. There is acute hemorrhage along the wound track. One thousand one hundred and fifty millimeters and 600 ml of liquid and clotted blood are within the right and left pleural cavities, respectively. Minimal residual blood remains within the pericardial cavity.

**Exit wound**: The exit wound is located on the right chest. The wound consists of a ¾" x ¼" Irregular defect located 52° from the right heel, 2 ½" from the anterior midllne, and 1" superior to the right nipple.

**Course and direction**: The gunshot wound proceeds from back to front, rightwards, and downwards.

(*Id.*). Dr. Armstrong's deposition was also taken. [6]

The Complaint asserts four claims for relief.  Count One alleges excessive force under 42 U.S.C. § 1983.  Counts Two, Three, and Four assert state law claims- survivorship action, wrongful death, and loss of consortium.

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

---

[6]     Following the Cleveland Police investigation, the Ohio Attorney General also reviewed this matter and presented it to the Grand Jury which issued a No Bill finding that defendant acted reasonably. (Doc. 67 Ex.34).

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is

13

"merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Excessive Force (§ 1983)**

Plaintiff alleges that defendant used excessive force in violation of the Fourth Amendment when he shot Keith multiple times while Keith "was unarmed at the time, and running away from Officer Griffiths, striking Mr. Keith in the back, and killing him." (Doc. 1 at 15). Defendant maintains that he is entitled to qualified immunity.

The Sixth Circuit has recently reiterated:

> The defense of qualified immunity protects officials when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818(1982). When it is asserted, the plaintiff has the burden of showing that the defendant is not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Applying qualified immunity requires asking: (1) whether an official violated a statutory or constitutional right and (2) whether that right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). When the answer to either of those questions is "no," the other need not be addressed. *Price v. Montgomery County*, 72 F.4th 711, 723 (6th Cir. 2023) (citing *Pearson*, 555 U.S. at 236, 129 S.Ct. 808).

*Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024). The contours of a claim involving deadly force by a police officer is well-established:

> The Fourth Amendment prohibits police from using excessive force while making an arrest, investigatory stop, or other type of seizure. See *Graham v. Connor*, 490 U.S. 386, 394-395 (1989). A use of force must be "objectively reasonable" to be constitutional. *Id.* at 397. Objective reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). It allows for the fact that "police officers are often forced to make split-second judgments" about the amount of force necessary "in circumstances that are tense, uncertain, and rapidly evolving." *Mullins*, 805 F.3d at

14

766  67 (quoting *Graham*, 490 U.S. at 396-97.

> Under the Fourth Amendment, an officer's use of deadly force is objectively reasonable only when there is probable cause to believe that the suspect poses an immediate threat to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham*, 490 U.S. at 396. To determine whether such probable cause exists, we consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Our precedent establishes that the question of whether a suspect posed an immediate danger is dispositive: where the suspect poses no immediate threat to the safety of an officer or others, the use of deadly force is unreasonable and violates the Fourth Amendment. *Foster v. Patrick*, 806 F.3d 883, 887 (6th Cir. 2015).

*Raimey v. City of Niles, Ohio*, 77 F.4th 441, 448  49 (6th Cir. 2023). See also *England v. City of Columbus, Ohio*, 2023 WL 3756177 (6th Cir. June 1, 2023) (citing *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)) ("The use of deadly force is objectively unreasonable unless an officer has probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others."); *Roberts v. Cruz*, 2023 WL 2181145, at *3 (6th Cir. Feb. 23, 2023) ("Broadly speaking, the Fourth Amendment prohibits the use of excessive force, and a determination of whether a particular use of force was excessive turns on its reasonableness under the totality of the circumstances. The relevant    although not exhaustive    circumstances for this analysis include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." ) (citations omitted).

Thus, the issue is whether, drawing all reasonable inferences in the plaintiff's favor, there is probable cause to believe that Keith posed an immediate threat to defendant. In

15

particular, the question is whether there is an issue of fact as to whether Keith had a gun and pointed it toward defendant.

Plaintiff maintains that the issue of whether defendant's use of deadly force in shooting Keith was objectively reasonable is a jury question. Plaintiff asserts that the eyewitness accounts establish that Keith never pointed a gun at defendant, Keith was never seen running with a gun, Keith was shot in the back while fleeing, and a gun was not observed on the ground where Keith fell after being shot. Plaintiff asserts that the testimony of the medical examiner and the autopsy report is consistent with the eyewitness accounts that Keith was shot in the back as he was attempting to flee.

Defendant argues that he was the single eyewitness to the shooting, and Melton and Starr are unable to contradict his testimony. Moreover, defendant's testimony is consistent with all the physical and forensic evidence which plaintiff has not refuted with an expert. Nor has plaintiff contradicted the testimony of Styles and Lenz regarding the fact that they heard defendant yell that Keith had a gun and commanded him to drop it. Plaintiff has also not contradicted the evidence that a gun was first seen by Styles just inches away from Keith's hand when he first reached Keith. Nor does plaintiff dispute the scientific evidence that confirmed Keith's DNA was on the recovered gun.

For the following reasons, the Court finds no issue of fact to preclude the granting of summary judgment.

Defendant's evidence shows that he was the only one of the three officers to witness the shooting as Officer Lenz and Sgt. Styles were on the opposite side of the van and admitted that they did not see who fired the gunshots. The on-scene statements of Styles and Lenz

16

both establish that they heard defendant alerting them that Keith had a gun, followed almost immediately by gunshots. Styles heard defendant yell, "Drop the gun, drop the gun!" Styles heard several gunshots, but did not know who fired the shots.  Lenz heard defendant yell, "Drop the gun, drop the gun!" He then heard several gunshots, but did not know who fired the shots.

Defendant correctly maintains that Sixth Circuit precedent establishes that when the defendant police officer is the sole witness, summary judgment is appropriate where there is no direct evidence to rebut the defendant's version of the events.  In *Burnette v. Gee*, 137 Fed.Appx. 806, 809 (6th Cir. 2005), the court recognized:

> where the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care. See *Plakas v. Drinski,* 19 F.3d 1143, 1147 (7th Cir.1994) (The "defendant knows that the only person likely to contradict him or her is beyond reach .... [s]o a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.").

Nonetheless,

> The district court concluded that there was no conflicting testimony on these issues because Gee and Wilson were the only two people to witness the event and because Wilson, now deceased, cannot offer a competing version of facts. Consequently, the district court accepted Gee's version of the shooting as true and decided that Gee did not violate Wilson's rights. Unfortunately for the appellants, no direct evidence exists to rebut Sheriff Gee's version of the events. Furthermore, even considering the circumstantial evidence presented by Appellants in a light most favorable to them, there is no reasonable basis for overturning the district court's finding that Wilson reached for or raised his rifle and struggled with Sheriff Gee over the weapon, and that as a consequence, Sheriff Gee reasonably feared for his life when he shot Wilson. We believe that the district court's thorough analysis of the facts supports its grant of summary judgment in favor of Sheriff Gee. See *Plakas,* 19 F.3d at 1146  47.

According to defendant's version of the events, Keith brandished his Glock with an

extended magazine, defied defendant's commands to drop the gun, took several steps as though he was going to run, and then turned and pointed his weapon at defendant who fired his weapon at Keith in self-defense. Defendant maintains that under these facts, Keith did not have a Fourth Amendment right to be free of deadly force, and defendant's actions were justified under the rapidly evolving, undisputed circumstances. This Court agrees and finds that defendant's use of deadly force was objectively reasonable because Keith posed an immediate threat to defendant's safety.[7] Plaintiff fails to raise an issue of fact on the following bases.

**(a) eyewitnesses**

Plaintiff asserts that "several eyewitnesses to the shooting reported that Mr. Keith did not have a gun in his hand when he exited the Pacifica, nor did they see a gun in Mr. Keith's hands as he was running from Officer Griffiths." (Doc. 81 at 7-8).

Initially, while plaintiff refers to the interview of Rayshawn Stewart, this Court has previously excluded this individual as a witness for purposes of summary judgment and/or trial. (Order, Nov. 30, 2023).

Plaintiff also discusses a report made by Cleveland Police Officers in March 2021 which summarizes statements made by Monica Hatcher to the police. Neither the officers nor

---

[7]     Because the question of whether a suspect posed an immediate danger is dispositive to the inquiry, the Court need not reach the two other factors.  Even if it did, those factors are met as well. As for the severity of the crime, it is undisputed that the CMHA PD received two 911 calls from the same caller reporting the location of the van that was suspected of being involved in the recent discharge of a firearm and criminal activity. It was believed that the occupant of the van might have possession of a firearm. As to the final factor, it is undisputed that Keith was actively resisting arrest or attempting to evade arrest by flight.

Hatcher were deposed.  The report conveys that Hatcher told police that she observed Keith running from a CMHA police officer who yelled at him to stop. She heard gunshots and Keith fell down.  She did not see Keith with a firearm. (Doc. 81 Ex. 16).  However, as defendant points out, the report shows that Hatcher did not witness the critical events.  The report states:

> Monica Hatcher stated that she observed Arthur Keith running from the police officer from across the street. Monica Hatcher pointed to 2573 Bundy Drive. Monica Hatcher stated Arthur Keith and the Officer were running towards her from the north side of the building located at 2573 Bundy Drive, across the Bundy Ave. and Arthur Keith fell in front of 6201 Haltnorth.
>
> Further investigation revealed that the incident did not start across the street where Monica Hatcher stated she observed Arthur Keith running from the officer. The incident actually started in the parking lot north of 6201 Haltnorth.

(*Id*). Thus, aside from the document being hearsay, it concludes that Hatcher did not witness the critical moments of the incident and that the incident occurred in a different area/parking lot.

This leaves the two juvenile witnesses Jahzir Melton and Demarion Starr. Defendant maintains that the deposition testimony of these witnesses establishes that neither witnessed the crucial events of November 13, 2020.  For the following reasons, this Court agrees.

As set forth above, Melton reported to a Cleveland Police Officer on the day of the incident what he had observed.  Melton did not mention whether or not he saw Keith with a gun.  (Doc. 81 Ex. 17). Melton's deposition was taken in September 2023. He testified in relevant part:

Q. Where was Mr. Keith when the shots were fired?
A. Basically still trying to get out the van door. He trying to run and get out, but he couldn't even turn, for real. That's before he started shooting.
***
Q. Were your eyes on Officer -- on the officer or the officers when Mr. Keith exited,

or were they on Mr. Keith?

A. My eyes was on the van door to see like if somebody like -- then I heard them yelling something, then that's when I seen somebody coming out, and it was Arthur, and that is when he tried to run. That is when he started shooting.

Q. Did you see Arthur turn and point his gun at the police officer?

A. No.

Q. Did you know that Arthur had a gun?

A. No.

Q. Did you know that when Arthur ran and fell by the tree, that his gun was right in front of his hands?

A. No.

***

Q. Did you see where Arthur fell?

A. Yes.

Q. When did you see him fall?

A. So when they starting shooting, boom, then that is when - - like before he got by like by the doorstep, I had heard- - I had run in the house because I was scared...

***

Q. Okay. When you got [back] outside, was Arthur already - - did he- - was Mr Keith already on the ground?

A. Yes.

***

Q. So you believe he was shot right outside the passenger door?

A. Yeah.

***

Q. So your testimony is Mr. Keith was standing right by the door when he was shot?

A. He wasn't standing, he was running away, trying to run away.

***

A. When he got out the van, he tried to run. That is when the officer started shooting.

Q. Could you see Arthur's left hand?

A. No.

Q. You could not?

A. You really only see like all this. (Indicating).

Q. You only saw from    you only saw Arthur from the shoulders up?

A. Yeah.

Q. Because of the distance and the cars?

A. Yeah.

Q. So you couldn't see what was in his left hand, right?

A. Right. No.

Q. No? And when you heard the shots fired, did you immediately run in the house?

A. Yeah. Not like    like I seen it, like boom, boom. And then when everybody start running and stuff, that's when I ran in the house

Q. Okay.

20

A. -- because I was scared.

Q. So you didn't see what was in Arthur's hands when he was running, did you?

A. No. Like

Q. You said no?

A. No.

\*\*\*

Q. So after you heard the shots- - I want to make sure.  Before you heard the shots, you said that all you could see was from the shoulders up of Mr. Keith, correct?

A. Because he was getting out the van.

Q. Okay. So you could not see his hands, correct?

A. Uh-uh.

Q. Is that correct?

A. Yes.

Q. Okay. And then after the shots were fired and he started to run, you ran in the house --

Q. -- because you were afraid, correct?

A. Yes, came back out.

Q. And then after it was over and Mr. Keith had ended up in the grass by the tree in the front of 6201 Haltnorth, you came back outside; is that correct?

A. Yeah.

(Melton depo. at 76-91).  Therefore, Melton's testimony shows that he could not see Keith's hands at the moment before and when he was shot.

As set forth above, Demarion Starr was interviewed by Cleveland police several months after the incident, and he stated that he did not see Keith with a firearm in his hand. Starr's deposition was taken.  Starr's testimony was inconsistent with the established physical facts.  Namely, Starr's testimony and the established facts are as follows:

- The van was red. However, the photographic evidence and the dispatch calls establish that it was black.
- The windows were not tinted and one would be able to see who was in the van. However, the photographic evidence and the dispatch calls establish that the windows were tinted.
- The van was facing forward.  However, the photographic evidence establishes that it had been backed in.
- Keith was in the front driver's side of the van and exited from the front driver's side. However, all the other testimony, including that of lay witness Melton, establishes that Keith was in the back passenger side and exited from the back passenger side.
- Defendant was on the front driver's side of the van, shouting to the man to get out. However, all the other testimony, including that of lay witness Melton, establishes that

21

defendant was on the front passenger side.
- Keith only took three or four steps before falling to the ground after the shots were fired.  However, the photographic evidence shows that he ran a longer distance.
- Keith fell to the ground in front of the gate of the parking lot.  However, the photographic evidence shows that Keith fell to the ground in front of 6201 Haltnorth by a tree.

(Starr depo. 36-67).  Furthermore, Starr also testified that "after the shots had went off,

[Keith] stayed right there.  But I had went into the house. I had run into the house after that."

He did not come back outside until "like five minutes after everything had happened."
(*Id.* at 67-68). He further testified:

Q. When he turned and faced the police officer, did you see him point his gun at the police officer?
A: No, he didn't point anything, he just ran away, like he was trying to get away from something.
Q. But when he turned -- the police officer says that he did have a gun and he pointed it at him.
*** From your point of view, could you have seen him do that if he had his back to you?

A. He never had his back to me. It was his side, and the officer was pointing the gun at him.
Q. Could you see what he was holding in his left hand when he was behind the car door?
A: No.
Q. Is it possible Mr. Keith had a gun in his hand and you just couldn't see it from your point of view?
A: No.

(*Id.* 73-74). But, Starr also testified:

Q. You were asked about whether you saw Arthur Keith holding a gun, by Mr. Jackson, correct?
A. Yes.
Q. And you could not see Mr. Keith's hands at all times, could you?
A. No.
****
Q. And you can't say that he did not have a gun by his hand when he fell to the ground, can you?
A. No, but I can say that after he got shot -- he was running. When he was -- when I saw him running, he did not have anything in his hands. And then that is when he had got shot and fell. As he was falling, there was nothing in his hands.

(Starr depo. 98-99).

Plaintiff maintains that "while there may be contradictions, and even conflicts, in the accounts given by the eyewitnesses to this incident, any such conflicts and contradictions are to be viewed in the light most favorable to the plaintiff, and any credibility determinations made from this testimony, must be done by the jury and not at summary judgment." (Doc. 81 at 28).

The Court agrees with defendant that the undisputed physical evidence negates the need for the credibility determinations.  As stated above, even Styles and Lenz testified that they did not see Keith holding a gun or pointing it at defendant. But, they did not see Keith's hands when he got out of the van. Nor did they notice Keith holding a gun as he was running. However, the undisputed physical evidence establishes that a gun was found next to Keith's hand on the ground where he fell, the gun was photographed on-scene in the back of a CMHA police vehicle, and the gun only had Keith's DNA match.  Additionally, the autopsy report and Dr. Armstrong's testimony (both discussed below) show that Keith was not shot in "the back" as plaintiff maintains, but in the extreme left side of the back. Dr. Armstrong agreed that defendant's version of the events is consistent with the gunshot wound. Defendant's description of the immediate events leading up to the discharge of his weapon is not contradicted by any witness, and no witness could see Keith's hands immediately before, during, or after the discharge. In particular, plaintiff does not dispute that Melton admitted he could not see Keith's hands at the moments leading to defendant's shooting and when Keith ran. Plaintiff further does not dispute that Starr admitted he could not see Keith's hands at all times.

**(b) declarations of Lenz and Styles**

Plaintiff asserts that Styles and Lenz have submitted declarations that "contain new and additional accounts of the incident that were never previously reported" in their previous two interviews to the police and their deposition testimony.  Specifically, plaintiff contends that Styles now states in his declaration that "I heard Griffiths say "stop don't move" and "gun" and he heard defendant state "he has a gun, he has a gun" and "[t]hereafter, I heard shots…."  And, Lenz's declaration now states "I heard a door pop and I heard Griffiths give the commands that included 'show me your hands.' Thereafter, I heard 3 or 4 shots fired…."

These statements are not new or contradictory to earlier statements.  Styles's on-scene statement related that he heard defendant yell, "Drop the gun, drop the gun!" His later videotaped interview stated that he heard defendant say, "Stop, don't move, gun."  Similarly, Lenz's on-scene statement stated that he heard defendant yell, "Drop the gun, drop the gun!" His videoptaped interview states that he heard defendant yell, "Show me you hands."

More importantly, all of the statements consistently establish that defendant yelled that  Keith had a gun.

**(c) declaration of Gonzalez**

Plaintiff maintains that Chief Gonzalez's declaration "amends and supplements" his prior account. (Doc. 81 at 10). The Court disagrees. Plaintiff points out that Chief Gonzalez's declaration states that he observed defendant standing by a fence near where Keith had fallen and holding a weapon that he recognized as not a CMHA PD weapon. The portion of Gonzales's deposition testimony to which plaintiff compares this statement in not contradictory or supplemental in any way.  Specifically, Gonzalez was asked by plaintiff's counsel whether he was aware of photographs showing the placement of the gun in the trunk

24

of the police car. Gonzalez testified that he was not aware of any photos of defendant taking possession of the firearm or of Burdyshaw receiving possession.  (Gonzalez depo. 111-113). This testimony is simply not inconsistent with the declaration testimony.

### (d) autopsy report

As set forth above, the autopsy report found the gunshot wound to be in the "postero-lateral left upper trunk." Dr. Armstrong's deposition testimony explains that the side of the body is divided by an imaginary line and anything behind that line is "postero" and anything in front of that line is antero.  The gunshot wound is several inches to the left of the dividing line in the postero portion of the body. (Armstrong depo. 117-118).  This means that the wound is inches from the imaginary line down the side of Keith's body. The report also states that the wound is 13 inches from the posterior midline. Dr Armstrong explained at deposition that the posterior midline is the spine- the midline of the back. (*Id.* 120-121)*.* Thus, while Dr. Armstrong testified that "the wound actually is not under the armpit," (*Id.* 129) the wound was only inches from the line along the side of the body and 13 inches from the spine.

A photo is submitted which shows the location of the gunshot wound. (Doc. 81 Ex. 4). Dr. Armstrong agreed that the decedent's arm in the photo is "being pulled forward by someone." (*Id.*  at 118).  Dr. Armstrong also testified:

Q:  It's been reported that Mr. Keith pointed his gun at Officer Griffiths and was turning to run and escape from apprehension. And Officer Griffiths, after the gun was pointed at him, fired in self-defense. Would that be consistent with where you noted the entrance wound on -- at the time you did the autopsy on Mr. Keith?

A: That scenario as presented would be consistent with the wound -- entrance wound that I described.

(*Id.* 129). She also testified that "if the position of his arm is down, then, yes, the wound

25

would appear that it would be closer to the upper part of the left arm." (*Id.*  120). And,

Q : And again, it's my understanding that it's consistent with what you noted that when Officer Griffiths reported that Keith turned, pointed the gun at him, and that's when he fired, he could have been turned, moving in this direction, and then the shot that was fired hit him in the area that you noted as the entrance wound in your report; correct?

A: That is one scenario, as I said before, that can explain my findings of the autopsy in relation to the wound.

(*Id.*  163). Thus, Dr. Armstrong's autopsy report and deposition testimony establish that the

gunshot wound is consistent with defendant's version of the events.

Plaintiff argues that the autopsy report shows that Keith was shot in the back because

the autopsy report states that the "gunshot wound proceeds from back to front, rightwards,

and downwards." But, this is merely consistent with the fact that Keith was shot 13 inches to

the left of his spine.  Plaintiff points to the doctor's deposition testimony, but this also shows

the same area:

A:... And then I went on to examine both externally and internally during the autopsy to determine that there was a single entrance wound of the extreme left side upper back that was connected to an exit wound on the right chest.

Q: So just for clarification, the entry wound that you're talking about entered through the back of Mr. Keith and out through the front of his body?

A: So I described and photographed and documented the entry wound to be the left side and upper back. And then I also identified an exit wound of the right chest.

(*Id.* 19-20).  Finally, plaintiff points out that she testified, "In this particular [autopsy]

photograph, I can see where the bullet had come in the back left rib cage area and had

fractured the rib in that location..." (*Id.* 32).  Again, this does not establish that Keith was shot

"in the back," but is consistent with the location described above.

Thus, the testimony plaintiff relies on does not establish that Keith was shot in the

26

back, but in the "extreme left side upper back."

**(e) the gun**

Plaintiff does not address the forensic evidence that Keith's DNA alone was found on the recovered handgun.  Plaintiff only addresses the fact that there is no crime scene photograph showing the gun lying next to Keith on the ground, and there is no evidence of any spent shell casings found in the area that were discharged from the Glock 9mm. Plaintiff maintains, "the extent to which these officers have alleged that Officers Griffiths secured from the ground next to Mr. Keith's body the gun allegedly pointed at him by Mr. Keith, this account raises genuine issues regarding the truth of this account, and whether this account was concocted to rebut eyewitness accounts that Mr. Keith never pointed a gun at Officer Griffiths and was never seen running with a gun." (Doc. 81 at 28). However, plaintiff's suggestion is wholly unsupported by any evidence to refute the contemporaneous photograph of the suspect's gun in the police car or the forensic evidence establishing Keith's DNA on the gun.

The DNA Laboratory Examination Report states the conclusions of the examination of the Glock model 19. There is no evidence to dispute that this was the firearm found near Keith's hand where he fell. The laboratory report found a match between the grip and trigger areas, the surface of the slide, and surface of the magazine and Keith.  It found no statistical support for a match between these areas and defendant or Burdyshaw. (Griffiths decl. Ex. B). This uncontroverted report is consistent with Keith having the gun in his hand as defendant reported even though no other witness saw it in his hand. Nor does plaintiff dispute the evidence establishing that it was Styles who first reached Keith and found the gun lying on

27

the ground where Keith fell, or that a hostile crowd gathered immediately making it necessary to secure the gun.  Plaintiff has not submitted evidentiary support for the assertion that Keith did not have a gun.

For these reasons, no issue of fact precludes the granting of qualified immunity.

**(2) State law claims**

Having found that defendant is entitled to qualified immunity, defendant is also entitled to summary judgment on the state law claims because he did not violate the Fourth Amendment's reasonableness requirement. As such, given that defendant's actions were objectively reasonable, he cannot be held liable for a survivorship action, wrongful death, or loss of consortium.

**<u>Conclusion</u>**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
_____
PATRICIA A. GAUGHAN
Dated: 4/30/24                                 United States District Judge